# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
March 8, 2018

Plaintiff-Appellee,

v

No. 330382
Macomb Circuit Court
LC No. 2014-003879-FC

ANDREW JOSEPH SPAGNOLA,

Defendant-Appellant.

Before: SHAPIRO, P.J., and GLEICHER and O'BRIEN, JJ.

PER CURIAM.

The prosecution charged that Andrew Joseph Spagnola abused his 11-week-old daughter, OS, by violently shaking her or intentionally banging her head on a hard surface. At trial, both parties' proofs centered on the radiologic images of OS's brain. The prosecution's expert witnesses, both pediatricians, testified that the images revealed the child was intentionally abused. The defense presented the testimony of a neuroradiologist who opined that radiologic studies demonstrated that OS's condition was chronic rather than acute, and likely related to the circumstances of her difficult birth rather than to intentional abuse. No one had ever witnessed any abuse. All of the experts acknowledged that because the child had no signs of abuse such as bruising or fractures, their opinions about what happened to OS hinged on the radiologic images.

During his closing argument, defense counsel stressed that the prosecution's two pediatric experts had offered conflicting interpretations of the radiologic images, the official radiology reports contradicted their conclusions, and that only the defense had presented the opinions of an actual radiologist. In rebuttal, the prosecutor first attacked the integrity of defense counsel and then proclaimed, with no evidentiary support, that the prosecution's radiology expert would have testified but for his vacation in Paris. Despite a proper objection to the latter improper comment, the court failed to give a curative instruction. The jury convicted Spagnola of first-degree child abuse, MCL 750.136b(2).

The prosecutor's grossly improper remarks were the last arguments the jury heard before deliberating, and remained uncorrected by the court. His deliberate misconduct so poisoned the proceedings that a new trial is required. Accordingly, we vacate and remand for further proceedings.

-1-

# I. BACKGROUND

On March 2, 2013, Spagnola was home alone with his 11-week-old twin daughters when OS's body went limp and then rigid and she became unresponsive. The infant had suffered a seizure. In the days that followed, Children's Hospital of Michigan (CHM) conducted computed tomography (CT) scans, ultrasounds, and magnetic resonance imaging (MRI) studies, which revealed that OS had subdural hematomas (bleeding between the skull and the dura, the outermost covering of the brain). An ophthalmologic exam demonstrated retinal hemorrhages (bleeding in all layers of the retina of the eye). Later, edema (swelling) and new brain bleeding were detected on the radiological images. OS survived, but has permanent disabilities.

OS, a breech twin, had been delivered via an emergency cesarean section. At birth, her head circumference was at the 10th percentile. When the birth-related swelling subsided, OS's head circumference fell to the third percentile. At age 11 weeks, the child's head circumference rose to the 85th percentile, a rapid increase. And her first 11 weeks had not been easy. OS had been treated for excessive vomiting and sometimes cried uncontrollably for extended periods of time.

The prosecution's theory was that Spagnola caused his daughter's injuries by shaking her or banging her head against a hard surface, a condition now known as abusive head trauma (AHT). In support, the prosecution presented evidence that Spagnola called his wife rather than 911 when OS's neurological symptoms emerged. The prosecution also relied on text messages Spagnola and his wife exchanged after the twins' birth to demonstrate that Spagnola had a "short fuse" and little patience with his family.

The rest was a battle of the experts. Before trial, Spagnola sought to exclude the testimony of the chief prosecution witness, Dr. Mary Angelilli, a board certified pediatrician and chief of staff at CHM, pursuant to *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993). Spagnola challenged the validity of Dr. Angelilli's diagnosis, but the trial court ultimately denied his motion.[1]

Dr. Angelilli testified at trial that she reviewed the various radiologic scans and the reports of OS's treating physicians at CHM. Dr. Angelilli perceived "a shearing injury" to OS's brain caused by "movement." She described that abrupt and violent motion, such as shaking a baby, can tear the brain's gray matter, resulting in the injuries OS displayed. In Dr. Angelilli's opinion, the pattern of injuries suffered by OS could have no natural cause. And as OS's parents reported no accident, the doctor deemed the injuries abusive.

Dr. Marcus DeGraw, the prosecution's second pediatric expert, maintained that OS had sustained "massive head trauma" consistent with "slamming" the child's head as hard as possible

---

[1] Spagnola did not contend that "Shaken Baby Syndrome," SBS/AHT, medicine is "junk science," likely because one of his own experts, Dr. Stephen Guertin, holds to its tenets. Instead, defense counsel questioned Dr. Angelilli about her theory of injury and explored her opinions about whether a chronic subdural could have caused OS's neurological deficits.

against a hard surface. When confronted with the radiology reports indicating that there was no bleeding inside OS's brain until several days after her hospital admission, Dr. DeGraw insisted that he interpreted the films differently than had the hospital radiologists:

> *Q.* But your testimony is despite the CAT scan of March the 3rd and the MRI of March the 3rd or March 4th not mentioning that intraparenchymal blood, the blood inside the brain, you believe it is there?
>
> *A.* Yes.
>
> *Q.* And that is a critical component to your conclusions in this case?
>
> *A.* Correct.[2]

Dr. Stephen Guertin, who is board certified in pediatrics and pediatric critical care, testified for the defense at trial. He opined that the marked and abrupt expansion of OS's head circumference was consistent with a chronic subdural hematoma—a lingering collection of blood between the brain and the dura, located outside of the brain itself. Birth-related subdurals occur in up to 20% of deliveries, Dr. Guertin explained. Those subdurals that fail to recede in the weeks after birth may rebleed spontaneously, Dr. Guertin testified, absent any trauma.

A second defense expert, Dr. Mark David Herbst, agreed with Dr. Guertin that OS had sustained a birth-related subdural hematoma. Dr. Herbst is board certified in radiology and subspecializes in neuroradiology. He reviewed all of OS's CT scans, MRIs and ultrasounds, and concluded based on the appearance of the blood that OS's chronic subdural hematoma bled acutely on the day she was first admitted to the hospital. That bleeding triggered a seizure, which in turn led to a prolonged period of hypoxia (lack of oxygen). Dr. Herbst further observed that when OS was admitted to the hospital, the tissue of OS's brain (the parenchyma) was entirely normal. And if OS had sustained a traumatic injury due to shaking or striking, the films would have shown blood *inside* her brain, Dr. Herbst asserted. Her brain did bleed a few days later, the films demonstrated, while OS remained hospitalized. That bleeding was precipitated by lack of oxygen (hypoxic ischemic injury) consistent with a stroke. In Dr. Herbst's view, the radiology images definitively ruled out a shearing injury that would have been visible on hospital admission had the child been violently shaken.

Dr. Herbst's interpretation of the images was entirely consistent with that of the CHM radiologists who authored the official radiology reports in OS's medical record. The record supplied to the court and the defense appears to be incomplete, in that it does not include reports of all of the images obtained during OS's hospitalization. Nevertheless, it includes several radiology reports stating that the images obtained on the day of admission revealed only subdural

---

[2] Dr. DeGraw was not qualified as a radiologist; indeed, he admitted that "I would not qualify myself as a radiologic expert." He claimed that he reviewed the films on his own, and never showed them to a radiologist.

hematomas; two days later, the CHM radiology reports call out the presence of a "**New** large intraparenchymal hematoma." (Emphasis added.)[3]

Other scientific evidence supported that OS had a birth-related subdural that bled, triggering a seizure and prolonged hypoxia, rather than a traumatic injury caused by shaking as theorized by the prosecution. When OS underwent neurosurgery to drain the subdural hematomas, the surgeons found straw-colored fluid. Dr. Guertin testified that it "usually takes a month to two months" for subdural blood to change to that color. This testimony was not refuted. Furthermore, all of the medical experts agreed that OS had no bone injuries, bruises, or other indications of abuse. Dr. Angelilli conceded that 85% of abused children have other detectable injuries.

On cross-examination, Dr. Angelilli agreed with the central premise of the defense—that it was "certainly possible" for a baby to have an undiagnosed birth-related subdural hematoma that rebled.[4] She conceded that OS's CT scan revealed bilateral subdural hemorrhages of at least two different ages, one being chronic. Dr. Herbst testified that CT scans and certain MRI images can detect even slight trauma to the skull, and that no such evidence appeared on OS's films.

Two additional medical findings generated controversy during the trial. The experts agreed that a traumatic shaking injury is often accompanied by an injury to a child's neck, similar to whiplash. A single CHM radiology report stated that one set of neck images were "suggestive of ligamentous injury" to the neck. Dr. Herbst explained that in radiology lingo, the term "suggestive" means that a closer look is needed before a true finding can be confirmed. Subsequent images, he opined, ruled out the presence of a neck injury. Once again testifying beyond his pediatric qualifications, Dr. McGraw asserted that an MRI scan showed a strain of OS's neck ligaments. Dr. Angelilli testified that she had not taken any possible neck injury into consideration when rendering her opinion "since it was not confirmed."

OS also displayed bilateral retinal hemorrhages, which proponents of SBS/AHT science believe to be virtually diagnostic of trauma. Dr. Guertin advised the jury that he falls into the camp of physicians who agree with the conventional approach to AHT diagnosis. However, he pointed out, chronic subdural effusions can also cause retinal hemorrhaging.

---

[3] Dr. Luis Goncalves authored the report, which described the injury as "[a] new hyperdense lesion . . . in the right temporoparietal region . . . consistent with a fresh intraparenchymal hemorrhage." Dr. Goncalves is a pediatric radiologist, see <http://www.phoenixchildrens.org/find-a-doctor/luis-f-goncalves-md> (accessed February 6, 2018).

[4] Dr. Angelilli admitted that she had never reviewed OS's birth or pediatric records. When confronted with evidence of the change in OS's head circumference, Dr. Angelilli conceded that the numbers were consistent with "something wrong in the head or the brain." Dr. Angelilli's incomplete review of the facts went unchallenged during the trial.

The prosecution's remaining evidence consisted of a number of messages exchanged in January and February of 2013 suggesting that Spagnola was not adjusting well to the introduction of two newborns into his life. The prosecutor quoted other text messages in which Spagnola's wife expressed concerns about defendant's anger. The prosecutor also quoted text messages sent and received shortly before Spagnola noticed that OS was unresponsive.

This trial was a battle of the experts. The underlying science was complex and the images on which the experts relied were not readily interpretable by lay persons. The radiologic evidence was critical to the outcome.

## II. THE ATTORNEYS' ARGUMENTS

Spagnola challenges the propriety of several of the prosecutor's emotionally-charged statements to the jury, as well as his personal attacks on defense counsel and his introduction of a critical fact not predicated on any trial evidence.

The prosecutor began his opening statement sentimentally, quoting from a book he "read to [his] children at night": "For those who can't speak for themselves, use big, bold voices." The prosecutor continued by declaring the proceedings "[OS]'s case;" telling the jurors that she was too young to testify before them but that they would "hear from doctors" and other witnesses and would "be able to piece it altogether and you are going to listen to [OS]'s voice." Later, the prosecutor informed the jurors that they would learn that Spagnola was home alone with his daughters at the time of OS's injury. He urged the jury, "Remember the times that you weren't patient enough and remember the times that that child was just so fussy you don't think there was anything else you could do, and remember those times that you loved that child enough to put the child down."

In closing argument, the prosecutor continued along this vein. He quoted from a Martina McBride song: "The statue stands in the shaded place. An angle [sic] girl with an upturned face. A name is written on a polished rock. A broken heart the world forgot." He also informed the jury: "I think about [OS], and I think about her growing up with her sister. I think about her asking questions: Why aren't I the same? What happened? Who did this to me?" The answer, the prosecutor stated, was that "[OS] was betrayed by her father."

Defense counsel began his closing with his strongest argument—the prosecutor's failure to present the testimony of a radiologist:

> [A]s you think about my comments and you think about the entire case and you deliberate, ask yourself: Well, why did the prosecutor not call any of the specialist[s]? Where was the radiologist from Children's Hospital? Where was the neuroradiologist from Children's Hospital?
>
> I mean, he had a child abuse expert masquerading as a radiologist telling you things that we know are just not true because you yourself were shown the films.
>
> Ask yourselves: Well, if it was that clear cut, where were they? Where were the radiologists? Where was the neurologist? Where was the expert on the

brain? Where was the neurosurgeon? Why did the defense have to call the child's pediatrician?

There was one doctor of the four who came in to testify about something other than whether or not this could have been abuse. Dr. Herbst, an expert in neuroradiology.

Counsel then pointed out that "one side gave you an actual specialist who got up there, and showed you why he thought and concluded" what he did. Counsel highlighted Dr. Angelilli's concession that the neck injury had not been confirmed, and that other evidence supported that OS had not sustained any trauma. He criticized Dr. DeGraw's theory that OS had undergone a violent, physical, slamming trauma, asserting:

The problem is, folks, is not a single specialist came into this courtroom to tell you that, in fact, is even possible.

In fact, the only specialist who came into this courtroom, Dr. Herbst, said in this case with these bleeds, it is not only not possible, it is impossible because the injuries were not there.

Defense counsel devoted most of his remaining argument to a review of the radiologic findings and the other medical evidence. He pointed out that even after being advised of possible trauma, the CHM radiologist noted that there was "no definitive evidence for intraparenchymal hemorrhage," and that none of the other radiology reports supported the prosecution's case. He reminded the jury that:

Two child abuse doctors who are not radiologists are trying to tell you that something is there that an expert in neuroradiology came to court and told you is not true.

And more importantly, their own radiologist that they base their opinions on tells you it is not true.

Instead of responding to this entirely proper closing argument with a response relevant to the evidence of defendant's guilt, the prosecutor began his rebuttal as follows:

Over and over and over again, always the same old dog and pony show. The same old magic show. The same old red herring. The same old smoke and mirrors. The same old "he didn't do it." He didn't prove his case.

I picked, I left each one of you on this jury because you are not stupid. Don't be stupid. Don't believe what you just heard.

Defense counsel did not object to these statements. The prosecutor immediately continued:

*Mr. Hosbein*: I hope that you appreciate that I didn't extend this trial because my radiologist is in Paris. Would that would have been a long trip back?

*Mr. Satawa*: Objection. What evidence is there that the radiologist was in Paris. That is completely inappropriate.

*The Court*: There was a discussion about the radiologist didn't testify. So let's move on.

There is no reference in the record of a "discussion" about the radiologist's absence that occurred in the presence of the jury. Furthermore, the medical records reflect that several different CHM radiologists authored the relevant reports. And the prosecution never identified any radiologist as a potential witness, even at the onset of the proceedings.

## III. PROSECUTORIAL MISCONDUCT

"A prosecutor has a special duty commensurate with a prosecutor's unique power, to assure that defendants receive fair trials." *United States v LaPage*, 231 F3d 488, 492 (CA 9, 2000). The line between prosecutorial vigor and prosecutorial excess is not always easy to draw. A memorable line in *Berger v United States*, 295 US 78, 88; 55 S Ct 629; 79 L Ed 1314 (1935), differentiates between "hard blows" and "foul ones." Another part of the same opinion instructs:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. [*Id*.]

The Supreme Court has frequently reminded that a prosecutor's comment "carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *United States v Young*, 470 US 1, 18-19; 105 S Ct 1038; 84 L Ed 2d 1 (1985).

Even so, a prosecutor is generally given "great latitude regarding his or her arguments and conduct at trial." *People v Fyda*, 288 Mich App 446, 461; 793 NW2d 712 (2010). "[P]rosecutors may use 'hard language' when it is supported by evidence and are not required to phrase arguments in the blandest of all possible terms." *People v Ullah*, 216 Mich App 669, 678; 550 NW2d 568 (1996). "Emotional language may be used during closing argument and is an important weapon in counsel's forensic arsenal." *Id*. at 679 (citation and quotation marks omitted). But, "[a] prosecutor may not appeal to the jury to sympathize with the victim. Nor may a prosecutor urge the jury to convict as part of its civic duty or on the basis of its prejudices." *People v Unger*, 278 Mich App 210, 237; 749 NW2d 272 (2008) (citation omitted).

Several of the prosecutor's statements crossed the line between proper and improper appeals to the jurors' sympathy. The prosecutor's recitation of music lyrics invoking the image of the grave of a murdered and forgotten child was improper. The prosecutor's other naked appeals to sympathy were attempts to divert the jurors' attention from the facts of the case and to inflame their passions. Standing alone, these statements would not demand a new trial. Even without an objection from the defense, the trial court instructed the jury that it "must not [allow] sympathy or prejudice [to] influence your decision." "Curative instructions are sufficient to cure

the prejudicial effect of most inappropriate prosecutorial statements." *People v Seals*, 285 Mich App 1, 22; 776 NW2d 314 (2009).

The prosecutor's statements during rebuttal closing argument, however, flagrantly violated legal rules and professional norms. A prosecutor should always avoid argument intended to inflame rather than enlighten. Rebuttal argument deliberately directing the jury's attention away from the evidence demands heightened scrutiny for two reasons. Not only is defense counsel deprived of any ability to respond, the improprieties are the last words the jury hears before beginning deliberations. See *United States v Holmes*, 413 F3d 770, 776 (CA 8, 2005); *United States v Williams*, 836 F3d 1, 15 (DC Cir, 2016) ("And the remark's potential for prejudice was even more pronounced because it occurred during the government's rebuttal—allowing the defense no opportunity to respond.").

The prosecutor began his rebuttal by disparaging defense counsel and the case defendant presented. The prosecutor characterized defense counsel's arguments as "the same old dog and pony show," "[t]he same old magic show," "[t]he same old red herring," "[t]he same old smoke and mirrors," and "[t]he same old 'he didn't do it.' " Because defense counsel raised no objection to these remarks, they are subject to review for plain error that affected substantial rights. *People v Brown*, 279 Mich App 116, 134; 755 NW2d 664 (2008). Reversal is warranted only when plain error results in the conviction of an innocent person, or seriously affected "the fairness, integrity, or public reputation" of the proceedings. *Unger*, 278 Mich App at 235. These comments impugned the integrity of the trial.

Because the prosecutor unleashed these improper comments during rebuttal, defense counsel had no opportunity to respond to this direct—and utterly baseless—attack on his integrity and that of the defense experts. Second, taken in full context—including the prosecutor's admonition that the jurors would be "stupid" to believe what defense counsel had argued—the prosecutor improperly expressed a personal opinion of Spagnola's guilt and the character of his counsel.

A prosecutor "may not personally attack defense counsel," *People v McLaughlin*, 258 Mich App 635, 646; 672 NW2d 860 (2003), or the credibility of defense counsel, *People v Kennebrew*, 220 Mich App 601, 607; 560 NW2d 354 (1996), or "suggest that defense counsel is intentionally attempting to mislead the jury," *Unger*, 278 Mich App at 236 (quotation marks and citation omitted). Here, the prosecutor did all three. The prosecutor repeatedly charged that defense counsel had made up the defense. Nothing could have been farther from the truth. The defense presented the unobjected-to testimony of two well-qualified experts whose testimony was not challenged as irrational, unreasonable, or scientifically suspect. The result in this case hinged on the expert testimony. In such cases, our Supreme Court has recognized that "it is especially important to protect against prosecutorial misconduct designed to impugn the credibility of the defendant's expert witness." *People v Tyson*, 423 Mich 357, 376; 377 NW2d 738 (1985). Simply put, no evidence or fair inferences supported the prosecutor's allegations.

Standard 3-6.8 of the American Bar Association Criminal Justice Standards for the Prosecution Function, Fourth Edition, informs our analysis:

(c)  The prosecutor should not make arguments calculated to appeal to improper prejudices of the trier of fact.  The prosecutor should make only those arguments that are consistent with the trier's duty to decide the case on the evidence, and should not seek to divert the trier from that duty.

 (d)  If the prosecutor presents rebuttal argument, the prosecutor may respond fairly to arguments made in the defense closing argument, but should not present or raise new issues.  If the prosecutor believes the defense closing argument is or was improper, the prosecutor should timely object and request relief from the court, rather than respond with arguments that the prosecutor knows are improper.

Characterizing defense counsel's argument as "smoke and mirrors," "the same old dog and pony show," and a "magic show" is nothing more than the expression of a personal belief that the defense and its witnesses have lied, or deliberately engaged in deceptive tactics.  Indisputably, a prosecutor may argue to a jury that a defense claim lacks merit because it is unsupported by evidence, or because it is illogical or contradicted by other evidence.  The prosecutor's name-calling did none of those things.  Rather, the prosecutor belittled defense counsel and the defense witnesses, implying that the testimony was part of some common defense scheme to hoodwink jurors.  There is nothing remotely fair in this argument.

Were that the prosecutor's sole transgression, likely we would still conclude that reversal is unwarranted.  But combined with what came on the heels of these plainly improper comments, we can reach no other conclusion but that defendant was denied a fair trial.

Regardless of whether a radiologist the prosecution wanted to call really was "in Paris," the prosecutor's comment was highly improper.  The prosecutor implied that had the radiologist been present at the trial, he or she would have testified in a manner consistent with the prosecution's theory of the case.  No evidence whatsoever supported this proposition, and the prosecutor knew it.  This was deliberate and calculated misconduct, and the prosecutor engaged in it precisely because the case was extraordinarily close.  The prosecutor no doubt recognized the central weakness in his presentation and the strength of the defense: the radiology.  Defendant had a radiology expert, the prosecution did not.  Defendant presented cogent and compelling arguments that the radiology exonerated him.  The prosecutor met this argument with prejudicial and inflammatory denigration of defense counsel and his witnesses, and then introduced evidence outside the record that a radiologist would have supported the prosecution's case but for a planned vacation to Paris.

We are unwilling to minimize the prosecutor's transgression or to chalk it up to a moment of unfettered zeal.  In personally attacking counsel and the defense witnesses and introducing evidence outside the record the prosecutor did not properly respond to any argument made by defense counsel.  Defense counsel's objection-free argument focused on the prosecution's failure to support its case with radiologic evidence and the centrality of that evidence to proof of what happened to OS.  The prosecutor met defense counsel's reasoned argument with an invitation that the jury instead believe that a witness who never testified would have supported the prosecution's case.  This flouted fundamental ethical precepts.  Despite counsel's objection, the trial court permitted the inference of favorable testimony to remain unsullied.

Although preserved, to warrant reversal, prosecutorial misconduct must deny the defendant a fair and impartial trial. *People v Mann*, 288 Mich App 114, 119; 792 NW2d 53 (2010).[5] This analysis requires an examination of the entire case, focusing on the context of the remarks. *People v Abraham*, 256 Mich App 265, 272-273; 662 NW2d 836 (2003).

This was a well-tried case. It was also an extraordinarily close case. Other than the radiology reports, the prosecutor had only scant and relatively unpersuasive evidence (text messages reflecting parental exhaustion) that Spagnola deliberately abused his child. When it came time for argument, the prosecution and defense arguments converged on the medicine, as both recognized that the prosecution's case would rise or fall on what the jury believed had caused OS's brain injury. Much of the expert testimony for counsel's review, however, was complex and abstruse. After the testimony of four experts (which consumed the vast majority of the trial time), both counsel undoubtedly understood that closing argument represented a vital opportunity to translate the testimony into understandable concepts, to highlight the strengths and weaknesses of the experts' presentations, and to motivate the jurors to view the evidence in a certain way. The United States Supreme Court has recognized the critical role that argument often plays:

> It can hardly be questioned that closing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case. For it is only after all the evidence is in that counsel for the parties are in a position to present their respective versions of the case as a whole. Only then can they argue the inferences to be drawn from all the testimony, and point out the weaknesses of their adversaries' positions. And for the defense, closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt. [*Herring v New York*, 422 US 853, 862; 95 S Ct 2550; 45 L Ed 2d 593 (1975).]

By telling the jury that he had expert testimony that would have refuted the defense experts but was prevented from presenting it due to unfortunate circumstances outside of his control, the prosecutor used the power of his office to circumvent the rule that only properly admitted evidence may be considered. Unfortunately, the trial court implied that the evidence actually existed ("There was a discussion about the radiologist didn't testify. So let's move on.") rather than instructing the jury to disregard the prosecutor's unfounded insinuation.

Spagnola draws our attention to other prosecutorial comments that he claims crossed the line between proper and improper argument. The prosecutor insinuated that Spagnola's hiring an attorney and Spagnola's brother's Internet research into SBS evidenced Spagnola's consciousness of guilt. In rebuttal, the prosecutor argued that after learning that there was "no

---

[5] Because prosecutorial misconduct implicates constitutional due process, we question whether the harmless error standard should instead apply. Under that standard, a new trial would be unwarranted only if the prosecution demonstrated that the prosecutorial misconduct was harmless beyond a reasonable doubt. *People v Miller*, 482 Mich 540, 559; 759 NW2d 850 (2008).

explanation" for OS's injuries, Spagnola conducted Internet research and "comes up with some terminology." Defense counsel objected because the trial evidence was that Spagnola's brother conducted this research, not Spagnola. After the court sustained the objection, the prosecutor continued undeterred, "All points, point to Andrew Spagnola."

Spagnola contends that this argument, too, violated his constitutional rights by implying that his attempt to protect himself from adverse legal proceedings reflected his consciousness of guilt. As Spagnola did not raise this challenge below, it is unpreserved and our review is limited to plain error affecting his substantial rights. *Brown*, 294 Mich App at 382. Spagnola relies primarily on *State v Angel T*, 292 Conn 262, 281-282; 973 A2d 1207 (2009), in which the Supreme Court of Connecticut held that the prosecutor violated the defendant's due process rights by arguing that his prearrest consultation with an attorney indicated his guilt. The court acknowledged that a defendant's Sixth Amendment right to counsel "does not attach until the commencement of adversary judicial proceedings via the filing of the information at the arraignment . . . and the separate and distinct fifth amendment right to counsel is limited to custodial interrogations by government agents . . . ." *Id*. at 282. The court concluded that "because these particularized rights had not yet attached when the defendant contacted his attorney, they are not implicated directly by the prosecutor's conduct in the present case." *Id*. at 283. However, the court further concluded that the prosecutor's argument was "highly prejudicial, as it is likely to give rise to the improper inference that a defendant in a criminal case is, or at least believes himself to be, guilty." *Id*. at 283. Although the defendant in *Angel T* failed to assert a timely objection, the court concluded that "[t]he prosecutorial impropriety deprived the defendant of a fair trial because it was pervasive, uninvited by the defendant, and was not subjected to specific curative measures as a result of what the defendant considers to be the [i]nexplicabl[e] failure of his trial counsel to object." *Id*. at 295 (quotation marks omitted). The court articulated several factors that made the defendant's guilt a close question, creating a possibility that the prosecutor's improper argument tipped the balance in the prosecution's favor. These factors included a lack of physical evidence corroborating the defendant's guilt, concerns that the complainant's mother's bias against the defendant adversely affected her credibility, and "multiple reports of jury deadlock" indicating that "the fact finder itself did not view the state's case against the defendant as particularly strong." *Id*. at 293-295.

The Connecticut court's decision is persuasive because it is consistent with the firmly established principle that "prosecutorial references to a defendant's post-arrest, post-*Miranda*[ *v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966),] silence violate a defendant's due process rights under the Fourteenth Amendment of the United States Constitution." *People v Shafier*, 483 Mich 205, 212-213; 768 NW2d 305 (2009). In *Shafier*, our Supreme Court stated:

> The United States Supreme Court has explained the rationales behind the constitutional prohibition against the use of a defendant's post-arrest, post-*Miranda* silence. To begin with, a defendant's silence may merely be the defendant's invocation of the right to remain silent, as opposed to a tacit acknowledgement of guilt. "[E]very post-arrest silence is insolubly ambiguous. . . ." Further, *Miranda* warnings provide an implicit promise that a defendant will not be punished for remaining silent. Once the government has assured a person of his right to remain silent, "breaching the implied assurance of

the *Miranda* warnings is an affront to the fundamental fairness that the Due Process Clause requires."

> Consistent with these rationales, a defendant's post-arrest, post-*Miranda* silence cannot be used to impeach a defendant's exculpatory testimony, or as direct evidence of defendant's guilt in the prosecutor's case-in-chief. "What is impermissible is the evidentiary use of an individual's exercise of his constitutional rights after the State's assurance that the invocation of those rights will not be penalized." There are limited exceptions to this general rule, but none applies here. This Court has adopted this understanding of a defendant's due process rights and stated that post-arrest, post-*Miranda* silence "may not be used substantively or for impeachment purposes since there is no way to know after the fact whether it was due to the exercise of constitutional rights or to guilty knowledge." [*Id*. at 213-214 (citations omitted).]

We agree with the court in *Angel T* that these principles also preclude a prosecutor from arguing that a defendant's consultation with an attorney before his arrest suggests consciousness of guilt. Although the prosecutor's argument in this scenario does not implicate a defendant's specific constitutional rights to counsel under the Fifth and Sixth Amendments, such arguments unfairly insinuate that a defendant's efforts to proactively safeguard his legal rights should be construed as evidence of guilt.

In this case, however, the prosecutor did not directly make this argument as defense counsel interrupted and objected on different grounds. Accordingly, the prosecutor did not actually violate Spagnola's rights in this manner.

The prosecutor also summarized the text messages between the Spagnolas and argued their importance for the first time in rebuttal. Defense counsel objected because he had not raised them in his closing, making them an improper topic for rebuttal. But the trial court overruled the objection and the prosecutor argued at length that the Spagnolas were experiencing marital problems "culiminat[ing] to this explosion on March 2nd." Spagnola also contends that the prosecutor presented a chart during rebuttal, which he must have created earlier, demonstrating that he intended all along to withhold certain argument until rebuttal.

MCR 2.513(L) limits the scope of the prosecutor's rebuttal closing argument "to the issues raised in the defendant's argument." Defense counsel made no mention of the text messages during his closing argument. Therefore, the prosecutor's summary of that evidence on rebuttal was improper and in violation of the court rule. This belated and evidently planned ambush denied Spagnola the opportunity to raise any argument in response. This was yet another example of the prosecutor's abuse of his rebuttal argument.

All of these actions, sometimes met with objection and sometimes not, fell outside the bounds of ethical conduct. And the prosecutor likely engaged in this course of misconduct because he knew his case was far from open-and-shut. In this context—a weak case with a strong defense—uncured prosecutorial misconduct is likely to tip the scales. An experienced prosecutor certainly would have understood that claiming to have supportive evidence that was not presented is misconduct; the "Paris" comment was unquestionably deliberate. The

prosecutor knew—or hoped, at least—that the jury would value his unsworn testimony, despite the prosecutor's likely awareness that he had broken a cardinal rule. The trial court did nothing to mitigate the impact of the prosecutor's improprieties, despite several objections. Because that comment combined with other misconduct denied Spagnola a fair trial, a new trial is required.

## IV. VALIDITY OF SBS/AHT EVIDENCE

On appeal, Spagnola contends that the trial court should have precluded Dr. Angelilli's testimony because the science behind SBS/AHT diagnoses has been debunked. Although Spagnola challenged the validity of the science in his motion for a *Daubert* hearing, he essentially abandoned that argument at the hearing, focusing on the deficiencies in Angelilli's qualifications to diagnose OS. We find no reversible error on this ground.

## V. REMAINING ISSUES

Given our resolution of these issues, we need not consider whether the trial court erred in denying Spagnola an opportunity to present surrebuttal testimony from Dr. Guertin in response to Dr. DeGraw. And Spagnola's challenge to the prosecution's production during discovery as a "document dump" is now a moot point. Defense counsel has now had more than adequate time to review the voluminous medical records and communications contained on 10 CDs provided during pretrial discovery. Moreover, contrary to the defense's complaint, the disks' contents were not so disordered as to be burdensome.

We vacate Spagnola's conviction and sentence and remand for a new trial. We do not retain jurisdiction.


/s/ Douglas B. Shapiro
/s/ Elizabeth L. Gleicher

-13-